# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| TRACI C. BAILEY, | : | Case No. 3:16-cv-419 |
| Plaintiff, | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| NANCY A. BERRYHILL, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

## DECISION AND ENTRY

## I. Introduction

Plaintiff Traci C. Bailey applied for period of disability, Disability Insurance Benefits, and Supplemental Security Income in June and July 2013, asserting that she could no longer work due to bipolar disorder, panic attacks, anxiety, and post-traumatic stress disorder. The Social Security Administration denied her claims initially and upon reconsideration. At Plaintiff's request, Administrative Law Judge (ALJ) Gregory G. Kenyon conducted a hearing where both she and a vocational expert testified. Shortly thereafter, the ALJ concluded that Plaintiff was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act. She brings this case challenging the Social Security Administration's denial of her applications.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Kenyon's non-disability decision.

## II. Background

Plaintiff asserts that she has been under a "disability" beginning on June 6, 2013. She was thirty-nine years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education with some college. *See id.* §§ 404.1564(b)(4), 416.964(b)(4).[1]

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Kenyon that she has bipolar disorder. (Doc. #6, *PageID* #92). She has mood swings that "happen periodically" about every three to four weeks. *Id.* She has "either manic or depressive" episodes. *Id.* Each one lasts three to four days; she does not know when they will occur or how long they will last. *Id.* at 92, 101. "The depressive episodes happen more often, but the manic episodes are more intense." *Id.* During her depressive episodes, Plaintiff experiences fatigue and "rarely get[s] out of bed." *Id.* at 93. "Housework goes to the wayside," and she lacks

---

[1] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

concentration and engagement in any kind of social situation. *Id*. She is also less likely to take showers. *Id.* at 97. In comparison, during manic episodes, Plaintiff stays awake for two or three days without sleeping. *Id.* at 94, 99. She has delusions: "I see that there's someone there that isn't there, but in my mind they are. And then I also have seen … my son's father who passed in 2002 …. I'll talk to him as if he's in the room, like he's there. And then I had a couple of times where I thought someone was there [but] I was told, then, later that [the person] wasn't even there." *Id.* at 94. And, "They talk back to me." *Id.*

Plaintiff often has racing thoughts—"things just keep coming through my head. I can't relax…. I'm constantly thinking what if, worrying, anxiety, sometimes panic." *Id.* at 95. She has panic attacks during which her heart races, she loses her breath, she cries, and she sometimes rocks. *Id*. The frequency of attacks varies—"Sometimes it could be [a] couple times a day and it could be a couple days." *Id*. To calm down, she tries to take deep breaths and remove herself from the situation. *Id.* at 96. At least once a week, she has flashback episodes and nightmares about her ex-boyfriend who assaulted her. *Id.* at 96-97. She has crying spells every day or every other day. *Id.* at 98.

Plaintiff has been seeing her psychiatrist, Dr. Stephanie Fitz, at South Community since 2003. *Id.* at 96. Typically, she sees her every four to six weeks, and "It's been about every four weeks … since she's been doing medication changes." *Id*. Indeed, Dr. Fitz changes her medications "usually every month that [she] see[s] her." *Id.* at 96, 99. Plaintiff explained that the medicine is helpful "at times." *Id.* at 95. But, she has some side effects—weight gain and fatigue or sleepiness. *Id.* at 102.

In the spring of 2013, Dr. Fitz spoke to Plaintiff about the possibility of low stress volunteer work to bolster her self-esteem. *Id.* at 100. However, "Because of the frequent changes in my medication, she suggested that I not try to pursue that because … she wanted to get me more stable." *Id.*

Since her last hearing in 2011, Plaintiff testified that her mental health status has become "increasingly worse." *Id.* at 99. She has "more frequent episodes lasting somewhat longer." *Id.* She experiences crying spells nearly every day or every other day. *Id.* at 98. She had social anxiety and no longer socializes with friends. *Id.*

Plaintiff lives in a condo by herself. *Id.* at 91. She has a fourteen-year-old son who lives with his grandparents "most of the time." *Id.* at 90-91. He spends a "couple nights" a week with her. *Id.* at 91. On an ordinary day, she wakes up and watches television. *Id.* at 98. Plaintiff has a driver's license but does not drive because she had trouble concentrating. *Id*. at 91. "The last few years I've had several accidents, and so the doctor and I came to an agreement that … I should probably stop driving." *Id.* She leaves home "[m]aybe every three, four days." *Id*. at 98. She goes to doctor's appointments, the grocery store, and, at night, to her parent's house to see her son. *Id.*

B.    **Medical Opinions**

i.    **Stephanie Fitz, M.D.**

Dr. Fitz, Plaintiff's treating psychiatrist, completed a mental impairment questionnaire on October 7, 2014. *Id.* at 623-26. She indicated that she had treated Plaintiff since 2003. *Id.* at 623. She diagnosed bipolar disorder and assigned a Global Assessment of Functioning score of 40. *Id.* Dr. Fitz opined that Plaintiff's impairments

4

have lasted for at least twelve consecutive months. *Id.* at 624. When asked to identify her patient's signs and symptoms, she indicated that Plaintiff completed the responses. *Id.* at 623. The signs and symptoms Plaintiff identified include, for example, poor memory, emotional lability, recurrent panic attacks, suicidal ideation or attempts, perceptual disturbances, decreased energy, manic syndrome, and hostility/irritability. *Id.*

Dr. Fitz opined that Plaintiff was extremely limited in 21 out of 25 areas of mental work-related functioning, including—but not limited to—her ability to maintain social functioning; work in coordination with or in proximity to others without being distracted by them or exhibiting extreme behavior; sustaining a normal routine without special supervision; and understanding, remembering, and carrying out short and simple instructions. *Id.* at 625-26. She concluded that Plaintiff would be absent from work more than three times per month. *Id.* at 624-25.

### ii. Frank Orosz, Ph.D., & Paul Tangeman, Ph.D.

On August 5, 2013, Dr. Orosz reviewed Plaintiff's record. *Id.* at 131-38. He opined that Plaintiff had moderate restrictions in her activities of daily living; moderate difficulties in social functioning; moderate limitations in concentration, persistence and pace; and no episodes of decompensation of extended duration. *Id.* at 136. Dr. Orosz adopted the mental residual functional capacity from the prior ALJ's decision on January 26, 2012: "Full range of work at all exertional levels, simple to moderately complex tasks in a low stress work environment [without] fast paced production quotas with only occasional contact [with] supervisor, only frequent contact [with] coworkers, no contact [with] general public." *Id.* at 138.

On November 12, 2013, Dr. Tangeman reviewed Plaintiff's record and confirmed Dr. Orosz's assessment. *Id.* at 155-62.

## III. Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disabilty," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc.*

*Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. The ALJ's Decision

As noted previously, it fell to ALJ Kenyon to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached the following main conclusions:

    Step 1:    Plaintiff has not engaged in substantial gainful employment since June 6, 2013.

    Step 2:    She has the severe impairments of a bipolar disorder, an anxiety disorder, post-traumatic stress disorder, and a history of polysubstance abuse.

    Step 3:    She does not have an impairment or combination of impairments that meets or equals the severity of one in the

>           Commissioner's Listing of Impairments, 20 C.F.R. Part 404,
>           Subpart P, Appendix 1.
>
> Step 4:    Her residual functional capacity, or the most she could do
>            despite her impairments, *see Howard v. Comm'r of Soc. Sec.*,
>            276 F.3d 235, 239 (6th Cir. 2002), consists of "a full range of
>            work at all exertional levels subject to the following
>            limitations: (1) limited to performing unskilled, simple,
>            repetitive tasks; (2) occasional superficial contact with co-
>            workers and supervisors; (3) no public contact; (4) no fast
>            paced production work or jobs involving strict production
>            quotas; and (5) limited to performing jobs in a relatively static
>            work environment in which there is very little, if any, change
>            in the job duties or the work routine from one day to the next."
>
> Step 4:    She is unable to perform any of her past relevant work.
>
> Step 5:    She could perform a significant number of jobs that exist in the
>            national economy.

(Doc. #6, *PageID* #s 68-79). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 79.

## V. <u>Discussion</u>

Plaintiff contends that the ALJ failed to properly evaluate the medical evidence and failed to properly consider her symptom severity. The Commissioner maintains that the ALJ reasonably assessed the medical source opinions and her subjective complaints.

### A. **Medical Opinions**

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

In the present case, ALJ Kenyon detailed the correct legal criteria applicable to the assessment of treating medical sources' opinions. He then provided good reasons, as the Regulations require, for not placing controlling or deferential weight on Dr. Fitz's opinions. Specifically, he found that Dr. Fitz's opinions that Plaintiff "has 'extreme' limitations in nearly all areas of work-related mental functioning … and that she would be absent from

9

work more than three times per month … cannot be given controlling, or even deferential, weight, because Dr. Fitz's opinion is not supported by the medical record and it is inconsistent with other medical evidence of record." (Doc. #6, *PageID* #76). He instead assigned Dr. Fitz's opinion little weight. *Id.*

ALJ Kenyon explained, "Her assessment stands in contrast to [Plaintiff's] South Community progress notes." *Id.* at 77. Overall, the notes show that Plaintiff "is quite functional when complying with medications and abstinent from illegal substances. She engages in a wide range of activities of daily living and, although she is somewhat socially avoidant and has some diminished stress tolerance, taken as a whole, the records from South Community portray [Plaintiff] as having a relatively high degree of day-to-day psychological functioning." *Id.* He emphasized, "She is able to live autonomously and can care for all of her own personal needs. She has a teenage son who spends some nights at her home, though he lives with his grandparents." *Id.*

Further, although Dr. Fitz opined Plaintiff has extreme difficulties in maintaining social functioning, the ALJ observed that she "goes out several times a week for purposes of visiting family, shopping for groceries or supplies, going to church occasionally, and occasionally going to AA meetings." *Id.* at 77, 625. The ALJ—consistent with the record-reviewing psychologists' opinion—did not conclude that Plaintiff had no limitation in this area. Instead, he found Plaintiff had a moderate limitation and thus limited her to occasional contact with supervisors and coworkers and no contact with the public. Similarly, Dr. Fitz found that Plaintiff has extreme "[d]eficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely

manner (in [a] work setting or elsewhere)." *Id.* at 625. But, the ALJ points out, she is able to read, watch television, go on the internet, and play games. *Id.* at 77. He did not indicate that these activities show Plaintiff is completely precluded from mental-work activities. He found instead she had a moderate limitation in concentration, persistence, or pace. He consequently restricted her simple, repetitive tasks.

Plaintiff contends that even if Dr. Fitz's opinion is not entitled to controlling weight, ALJ Kenyon erred in failing to consider her opinions under the factors. But, the ALJ did address several of the factors. For example, he acknowledged that she was her treating psychiatrist at South Community. *Id.* at 76; *see* 20 C.F.R. § 404.1527(c)(2) ("Treatment relationship"); 20 C.F.R. § 404.1527(c)(5) ("Specialization"). He noted that Plaintiff testified that she had been seeing Dr. Fitz since 2003 and saw her every four to six weeks. (Doc. #6, *PageID* #74); *see* 20 C.F.R. § 404.1527(c)(2)(i) ("Length of the treatment relationship and the frequency of examination"). He further discounted the questionnaire she completed as a "check-off form." (Doc. #6, *PageID* #76); *see* 20 C.F.R. § 404.1527(c)(3) ("Supportability"). ALJ Kenyon set forth and applied the correct legal criteria to Dr. Fitz's opinion. He provided good reasons, supported by substantial evidence, for assigning Dr. Fitz's assessment little weight.

Plaintiff further alleges that the ALJ erred by failing to evaluate the opinions of the State agency psychologists under any of the factors and by applying significantly more rigorous scrutiny to the treating psychiatrist than the record-reviewing psychologists. (Doc. #7, *PageID* #817). According to Plaintiff, these errors are particularly egregious because the record-reviewing psychologists did not review the complete case record. *Id.*

11

at 818. Indeed, she points out that they did not review Dr. Fitz's opinion, evidence of her June 2014 hospitalization, and treatment notes showing frequent medication changes and "erratic behavior." *Id.* at 818-19. Plaintiff contends that the ALJ is not qualified to interpret the mental health record on his own. *Id.* at 819.

The ALJ assigned the assessments of record-reviewing psychologists, Dr. Orosz and Dr. Tangeman, great weight. (Doc. #6, *PageID* #75). They—having seen "little change in [Plaintiff's] functionality since the time of the prior ALJ decision"—adopted the mental residual functional capacity of the previous ALJ. *Id.* at 72, 75-76. The ALJ first discussed their opinions at Step Three, observing that they opined Plaintiff had moderate limitations in her activities of daily living; social functioning; and concentration, persistence, or pace. He also identified some of the evidence they relied on. For instance, "they pointed out that [Plaintiff's] Progress Notes from South Community showed that, in January 2013, [she] was feeling more stable, was sleeping better, that she had updated her resume and was looking for part-time work. …" *Id.* at 72 (citation omitted). The ALJ reached the same conclusions about Plaintiff's limitations, and, in doing so, also identified the evidence that supports their opinions. For example, looking at her activities of daily living, the ALJ noted Plaintiff "is able to do household chores, cook, water her flowers daily, go to church and AA meetings occasionally, visit with her son, shop for groceries …." *Id.*

The ALJ also acknowledged that there has been some new and material evidence since their review—specifically, the records of Plaintiff's June 2014 hospitalization. The

12

ALJ found that this new evidence "warrants a restriction for work in environments where there is little change …." *Id.* at 75-76.

In reaching this conclusion, a review of the ALJ's decision reveals that the ALJ did not interpret mental health records. He identified some new and material evidence but concluded that it was not reflective of her day-to-day functioning as shown by the treatment notes in the record. Further, he compared her recent treatment notes to her older treatment notes, and found similarities. Notably, Plaintiff asserts that treatment notes from after the hospitalization in June 2014 were consistent with earlier treatment notes in August and September 2013. (Doc. #7, *PageID* #820-21). Dr. Orosz reviewed Plaintiff's records in August 2013—including treatment notes through July 2013— and Dr. Tangeman reviewed them in November 2013—including notes through at least August 2013. If the treatment notes from before her hospitalization are consistent with the notes from afterwards, then the record-reviewing psychologists' failure to review those later notes is not as significant as Plaintiff claims.

Plaintiff contends that, in weighing the medical opinions, the ALJ misinterpreted or misrepresented some of the evidence. First, "ALJ Kenyon erroneously found that [she] testified that Dr. Fitz 'has been changing her medications occasionally' …." *Id.* at 819 (emphasis in original) (quoting Doc. #6, *PageID* #s 74-75). Plaintiff claims that she "actually testified that Dr. Fitz changed her medications frequently—'usually every month that I see her' …." *Id.* at 820 (emphasis in original) (quoting Doc. #6, *PageID* #s 96, 99-100).

13

The record shows that Plaintiff first testified that she sees Dr. Fitz every four to six weeks—"It's been about every four weeks in the last - - since she's been doing medication changes." (Doc. #6, *PageID* #96). Later, her attorney stated: "And I noticed in your records that your doctor has been frequently attempting to change your medication regimen. What's going on there?" *Id.* at 99. Plaintiff responded, "I'll come in with usually whatever is bothering me in the more recent days and explain to her, and then she makes an assessment of what she wants to changes. It changes usually every month that I see her." *Id.* Plaintiff did not testify that Dr. Fitz changed her medication "frequently" or "occasionally." The ALJ acknowledged her testimony that she sees Dr. Fitz every four to six weeks and that Dr. Fitz changes her medication. The ALJ did not misinterpret or misrepresent this evidence.

Second, Plaintiff asserts, "the ALJ's finding that [Plaintiff's] June 2014 hospitalization was an 'isolated incident' that was 'easily rectified by getting [Plaintiff's] medication regimen back on track' is similarly unsupported by substantial evidence and is based on errors of law." (Doc. #7, *PageID* #820). She argues that treatment notes following Plaintiff's hospitalization show continued problems. *Id.* at 820-22.

Substantial evidence supports the ALJ's statement that it was an isolated incident, as the record contains evidence of one psychiatric hospitalization. And while Plaintiff is correct that the record shows she continued to have some problems following her release from the hospital, substantial evidence also supports the ALJ's assessment that her condition *improved* once she was back on the correct medications. For instance, at her first appointment with Dr. Fitz after the hospital stay, Dr. Fitz noted that she reported,

"she is now thinking clearly & feels she doing better with med changes." (Doc. #6, *PageID* #592). Additionally, Plaintiff's mood/affect was calm and composed. *Id.* Although later notes indicate that she continued to have some difficulty, even Plaintiff asserts that treatment notes from after the hospitalization in June 2014 were consistent with earlier treatment notes in August and September 2013. (Doc. #7, *PageID* #s 820-21). If the notes before her hospitalization were consistent with the notes afterwards, then it is difficult to understand how the notes from after the hospital visit show her condition had worsened.

Accordingly, Plaintiff's challenges to the ALJ's review of the medical source opinions lack merit.

  **B.**   **Plaintiff's Symptom Severity**

Plaintiff contends that the ALJ failed to properly evaluate Plaintiff's symptom severity as required by Soc. Sec. R. 96-7p, 1996 WL 374186 (Soc. Sec. Admin. July 2, 1996). Specifically, "he did not explain how he decided which of [Plaintiff's] statements to believe and which to discredit, other than vague, general references to the record." (Doc. #7, *PageID* #823) (citation omitted).

The ALJ evaluated Plaintiff's credibility and found that her statements regarding the intensity, persistence, and limiting effects of her symptoms were "not entirely credible …." (Doc. #6, *PageID* #80). "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of*

*Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987); *see Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007); *see Nettleman v. Comm'r of Soc. Sec.*, No. 17-1443, 2018 WL 652533 (6th Cir. Feb. 14, 2018) (quoting *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Given the deferential substantial-evidence standard, '[c]laimants challenging the ALJ's credibility findings face an uphill battle.'")). However, substantial evidence must support an ALJ's credibility assessment. *Cruse,* 502 F.3d at 542 (citing *Walters,* 127 F.3d at 531).

The ALJ provided several reasons for concluding Plaintiff's statements are not entirely credible. For example, he compares her statement that her condition became worse in 2013 to the progress notes that show she was "maintaining a relatively high degree of functioning, including living independently in a condominium and caring for her teenage son at least some of the time." (Doc. #6, *PageID* #s 74-75). He points out that although she stated she has trouble being around people, she goes to the grocery store, visits family, and attends church and AA meetings. *Id.* at 75. Despite these somewhat inconsistent statements, he restricted her to occasional contact with supervisors and coworkers and no contact with the public. *Id*.

Plaintiff further argues that although the ALJ was correct in considering activities such as watching TV and grocery shopping, "participation in these types of limited, sporadic activities does not constitute substantial evidence of [her] maximum ability to perform typical work activities on a sustained, regular and continuing basis, which is how functional limitations are required to be assessed." (Doc. #7, *PageID* #824). The ALJ did not use these activities to show she can perform work activities. Instead, he questions

16

her reliability based on the several inconsistencies he identified. For example, he does not imply that because Plaintiff can go grocery shopping, she can work with people all the time. Instead, he identified the discrepancy between her ability to go to the grocery store and her statement that she has trouble being around people. *See Walters,* 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.") (citations omitted).

Accordingly, for these reasons and given that an ALJ's credibility assessment are generally due great deference, *Walters,* 127 F.3d at 531, Plaintiff's challenges to the ALJ's credibility determination lack merit.

**IT IS THEREFORE ORDERED THAT**:

1. The ALJ's non-disability decision is affirmed; and
2. The case is terminated on the Court's docket.

Date:  March 28, 2018              *s/Sharon L. Ovington*
                                   Sharon L. Ovington
                                   United States Magistrate Judge